Usha **VAKHARIA, M.D., Plaintiff,**

v.

**LITTLE COMPANY OF MARY HOSPITAL AND HEALTH CARE CENTERS, David J. Roth, M.D., Chidambaram Srinivasan, M.D., Susan Carpo, M.D., Norma Cadayona, M.D., Hae Chang Lee, M.D., Tenkasi Subramanian, M.D., Joon Suk Yu, M.D., Manual U, M.D., Jarema Skirnyk, M.D., Southwest Anesthesia As-**

sociates, S.C., Evergreen Anesthesia and Pain Management Services, S.C., Kent F.W. Armbruster, M.D., Bernard P. Flaherty, M.D., Martin J. Phee, M.D., Lourdes D. Floro, M.D., Robert J. Bruno, M.D., Jose M. Cava, M.D., William J. Farrell, M.D., George F. Hogan, M.D., Michael M. Stachowski, M.D., Alice M. Stratigos, M.D., Douglas Webster, D.O., Frederick E. Wohlberg, M.D., Leo J. Knaff, M.D., James A.K. Lambur, M.D., George Miller, III, D.O., Sister Kathleen McIntyre, L.C.M., Claus Von Zychlin, John Prout, Frank J. Schaffer, George J. Cullen, Leo E. Hennessy, Sister M. Damian Young, L.C.M., Richard M. Farell, M.D., Vincent Gavin, James Keane, Mary Ellen McGuire, Thomas E. Murray, Ed.D., Thomas S. Patricoski, M.D., Michael B. Schneider, Sister Sharon Ann Walsh, L.C.M., Albert C. Baldermann, Michael R. Callahan, and Professional Staff of Little Company of Mary Hosp. and Health Care Centers. Defendants.

No. 94 C 5599.

United States District Court,
N.D. Illinois,
Eastern Division.

March 7, 1996.

Allen E. Shoenberger, Chicago, IL, for plaintiff.

Laurence H. Lenz, Jr., Harry John Secaras, Paul A. Haskins, Katten, Muchin & Zavis, Chicago, IL, for defendants.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court are the motions of the above-named Defendants to dismiss the Complaint of Plaintiff Dr. Usha Vakharia ("Vakharia"). For the following reasons, the motions are granted in part and denied in part.

### I. Background

In an effort to state a claim, Plaintiff has thrown everything but the proverbial kitchen sink into her Amended Complaint ("Complaint").[1] Naming an estimated 500 Defendants in 178 paragraphs spread over fifty-one pages, the document struggles to allege simple discrimination, antitrust, and breach of contract and bylaws claims.

Vakharia is a 49–year–old Asian Indian medical doctor practicing since 1974. She is licensed to practice in Illinois and is Board certified in anesthesiology.

The Defendants include Little Company of Mary Hospital and Health Care Centers ("the Hospital"), and its entire Professional Staff ("Staff"). Defendant Southwest Anesthesia Associates, S.C. ("Southwest"), "is or was" a corporation "involved in the supply of anesthesia services" at the Hospital. Defendant Evergreen Anesthesia and Pain Management Services, S.C. ("Evergreen"), is a corporation involved in the same activity as Southwest.

Also named are Doctors David Roth ("Roth"), Chidambaram Srinivasan ("Srinivasan"), Susan Carpo ("Carpo"), Norma Cadayona ("Cadayona"), Hae Chang Lee ("Lee"), Tenkasi Subramanian ("Subramanian"), Joon Suk Yu ("J. Yu"), Manual Yu ("M. Yu"), and Jarema Skirnyk ("Skirnyk"), who were staff anesthesiologists at all times relevant to the Complaint. Doctor Kent Armbruster ("Armbruster") has served as the Hospital's Medical Director since 1993. Doctor Bernard Flaherty ("Flaherty") was president of the Staff in 1992 and 1993. Doctor Martin Phee ("Phee") is the current president of the Staff. Defendant Sister Kathleen McIntyre ("McIntyre") was President of the Hospital at all relevant times until June 1994. Defendant Claus von Zychlin ("Zychlin") was the Executive Vice President or the President of the Hospital at all relevant times since March 1993. Defendant John Prout ("Prout") was Executive Vice President through Fall 1992. Defendant Michael Callahan ("Callahan") is an attorney who counsels the Hospital regarding termination of physician staff membership and privileges.

Also named are members of the Hospitals Medical Executive Committee ("MEC"): Armbruster, Flaherty, Phee, Lourdes Floro ("Floro"), Robert Bruno ("Bruno"), Jose Cava ("Cava"), William Farrell ("Farrell"), George Hogan ("Hogan"), Michael Stachowski ("Stachowski"), Alice Stratigos ("Stratigos"), Douglas Webster ("Webster"), Frederick Wohlberg ("Wohlberg"), Leo Knaff ("Knaff"), James Lambur ("Lambur"), George Miller III ("Miller"). Vakharia names the following members of the Hospital's Board of Directors ("Board") as well: Flaherty, Phee, Cava, Lambur, McIntyre, Zychlin, and Doctors Richard Farell ("Farell"), Thomas Murray ("Murray"), Thomas Patricoski ("Patricoski"), Michael Schneider ("Schneider") as well as Sister Damian Young ("Young"), Sister Sharon Ann Walsh ("Walsh"), Frank Schaffer ("Schaffer"), George Cullen ("Cullen"), Leo Hennessy ("Hennessy"), Vincent Gavin ("Gavin"), James Keane ("Keane"), Mary Ellen

---

1. Vakharia amended her original complaint to include the Title VII and ADEA claims after filing with the EEOC.

McGuire ("McGuire"), and Albert Baldermann ("Baldermann").

Generally, Vakharia complains of Defendants' action, or inaction, in processing her application for full anesthesiology privileges at the Hospital and in selecting an exclusive provider group for anesthesiology services. Vakharia states that the Hospital, after determining its need for physicians, screens potential applicants through a pre-application process. After the pre-application process, the Hospital provides applications. The Board regulates credentialling, and the Staff regulates privileges under the bylaws.

Before the Hospital selected Evergreen as its exclusive provider of anesthesiology services in February 1994, Hospital anesthesiologists were engaged in an employment relationship with the Hospital, and entered contracts with individual patients assigned to the anesthesiologists by the Hospital.

Vakharia repeatedly alleges that, at all relevant times, the Hospital had a need for anesthesiologists. This need was manifested by numerous alleged complaints and scheduling problems.

Vakharia completed pre-application papers for active privileges in both the Obstetrical and Gynecological ("OB/GYN") and Surgical sections of the Hospital's Anesthesiology Department ("Department") in February 1992. In March 1992, the Hospital granted Vakharia temporary privileges in only the OB/GYN section and provided her with a copy of the Professional Staff Bylaws ("Bylaws") and the Department Rules and Regulations ("Rules"). Vakharia states that Roth played a role in the denial of her Surgical section privileges.

Vakharia alleges that in August 1992 she "reapplied" for active privileges in the Surgical and OB/GYN sections. The Hospital and Roth failed to process this application within sixty days, which Vakharia contends was in violation of the Bylaws. Vakharia contends that the Board and the MEC knew of her reapplication, yet failed to insure that it was processed within the prescribed time period despite the Hospital's shortage of anesthesiologists.

Also in August 1992, Roth, then Chair of the Department, attempted to organize a group of anesthesiologists, known as Southwest, to exclusively provide anesthesiology services to the Hospital. Vakharia contends that Roth did so in order to force the anesthesiologists to surrender their privileges without the protection of the appeals process provided by the bylaws, to lower their pay, and to eventually terminate them from the Staff. Vakharia avows that Roth began to recruit white males to replace female foreign anesthesiologists, like Vakharia, in violation of the Bylaws and the Rules. Vakharia states that Roth slated her for removal not only because of her race, but also because of her age. Vakharia avows that he did so as part of an illegal agreement with the Hospital, the Board, the MEC, Prout, and McIntyre, and that every Defendant knew of the scheme. One such white male was Dr. Mark Krause, who was granted privileges in the Surgical section in violation of the Bylaws and the Rules. As part of his attempt to form an exclusive provider group, Roth presented pro forma employment contracts to all members of both Department sections, to which many anesthesiologists objected. Prout and the Hospital attempted to force all anesthesiologists to join the group.

In September 1992, the Hospital and Prout did not directly respond to an exclusive provider contract offered by a second group of anesthesiologists, consisting mostly of Asian females. That second group informed Roth that they intended to vote him out as Department Chair at a bi-yearly election which was due to be held in October 1992. Roth attempted to solicit the support of the second group for Southwest. When refused, Roth told one member of the second group, "When I take over the Department, I am going to give you a one-way ticket to the Philippines"; Roth also said that he would terminate the female Asian anesthesiologists from the Surgical section. McIntyre instructed the Department to postpone the election in violation of the Bylaws. By December 1992, the election had been held and a non-Defendant anesthesiologist, Dr. Padma Rao ("Rao"), became the Chair of the Department.

In January 1993, all Department members "indicated a desire to cooperate" with a group being formed by Rao, and Armbruster encouraged Department members to work together as a team. In February 1993, McIntyre also encouraged Rao to form a group to negotiate an anesthesiology contract with the Hospital.

Also at that time, Vakharia asked Rao about the status of her re-application. Vakharia declares that Rao initiated processing of Vakharia's application, as well as the application of Srinivasan (an Asian male) in February 1993. Vakharia states that Srinivasan's application was approved that same month, and that he immediately began on regular rotation in the Surgical section. In March 1993, Rao raised Vakharia's reapplication for consideration at the Department meeting. At the meeting, the Department continued consideration of the reapplication until the next monthly meeting. On March 29, McIntyre extended Vakharia's interim privileges to include Surgical, as well as OB/GYN, section privileges.

The Hospital hired Zychlin as Executive Vice–President in March 1993. Vakharia avers that one of Zychlin's primary objectives was to form an anesthesiology group headed by Roth. According to Vakharia, and based on her speculation, Zychlin's motivation sprang from his desire to terminate all female Asian members of the Department. Vakharia understands that, several years before, Callahan had proclaimed that he would "make sure that plaintiff never practices medicine again." (Compl. at 17.) Zychlin and Callahan met to carry out their plan in March 1993.

At the April 1993 Departmental meeting, the Department approved Vakharia for "Provisional Associate with privileges as noted." (Compl. at 18.) Vakharia avows that, one day later, Cadayona, Roth, Skirnyk, Srinivasan, Subramanian, and M. Yu conspired and instituted a group boycott of the Plaintiff from providing anesthesia services in the surgery section. *Id.* In that same month, Vakharia says that Carpo, Lee, J. Yu, Zychlin, McIntyre, the Hospital, its Board and its MEC enlisted in the conspiracy. She states that this conspiratorial boycott arose in viola-

tion of the Bylaws and the Rules and required her immediate placement on regular rotation. The conspiracy, however, ventured to place Vakharia on only an " 'as needed basis,' subject to ... [the conspirators'] ... whims and fancy." The boycotters then caused Rao to send Vakharia a letter, importuning Vakharia's compliance with their scheme. Vakharia refused to comply, declaring the scheme in violation of the Bylaws and Rules.

In May 1993, the Department further approved Vakharia for a special anesthesia procedure, and forwarded her reapplication to the Credentials Committee, requesting that Vakharia be granted only "as needed" privileges. The Credentials Committee declined the Department's request for the "as needed" classification, indicating that the Bylaws did not provide for such a classification, and stated that the Department would have to either approve or disprove Vakharia's reapplication.

In May 1993, Rao submitted a proposed anesthesiology group agreement to the Hospital administration. Zychlin then met with the Department in a special meeting and, upon Roth's requests, with each anesthesiologist individually. Rao's proposal was placed "on hold" by the Hospital administration.

In June 1993, Callahan began working for the Hospital, supervising the entire selection of a new anesthesiology director. Vakharia asserts that the Hospital intended to ensure that female Asian anesthesiologists were forced to relinquish their privileges without the Bylaws' due process, and to grant Roth an exclusive contract and install him as Chair of the Department. According to Vakharia, "Callahan was responsible for designing and directing the entire process which led to the removal of ... Rao and installation of ... Roth" and Evergreen. (Compl. at 21.)

Rao inquired of the Board as to why her proposal was not approved. "She had previously been informed that the primary reason for the refusal was that she was filling the department with too many Indians, and in particular that she had acted on Plaintiff's application for staff privileges." (Compl. at 22.) The Board did not respond.

Also in June 1993, the Department approved Vakharia's reapplication for privileges. Later that month, the Credentials Committee and MEC also approved Vakharia with full privileges. During July, the Board "approved Plaintiff's appointment as a member of the . . . [S]taff as a provisional associate with full privileges to practice in the Department." Despite the title of "provisional" associate, Vakharia states that the Board "did not impose any restrictions, limitations, or conditions on her right to practice at the Hospital. In particular, the right to practice was not limited to 'as needed.'" (Compl. at 22.)

At that time, the Board also approved a resolution to begin the process of selecting a medical director and an exclusive provider agreement. It stated that it did so in order to enhance the quality of care rendered to Hospital patients. However, Vakharia asserts that the administration established a selection process which would "sanitize" the Department by installing Roth as Chair and removing all female Asian anesthesiologists from the Staff.

After Vakharia received notification of the approval of her application in July 1993, both she and Rao requested that Vakharia be placed on regular rotation. Vakharia alleges that McIntyre and Zychlin pressured Rao not to place Vakharia on regular rotation. Vakharia says that Zychlin also told other Department members not to use Vakharia's services. However, Rao and Dr. Shah, "primarily," assigned some of their cases to Vakharia. (Compl. at 23.)

Also in July 1993, the Hospital invited all Staff anesthesiologists to apply for the position of Chair of the Department, and to form an exclusive provider group. Vakharia asserts that this invitation was a "sham," as it was common knowledge that McIntyre and Zychlin had already schemed to award the exclusive provider contract to Roth. Despite this "common knowledge," seven anesthesiologists applied for the position, five of whom were minorities, including Vakharia.

Vakharia declares that, in November 1993, after full completion of the sham selection process, Roth was selected as director of the Department, with full responsibility for con-

tact between the Hospital and the exclusive provider group. Srinivasan was selected as president of the group, with full responsibility for financial, legal, and compensation management of the group. Vakharia quotes Zychlin as saying "in all matters, decision [sic] of Dr. Roth are final . . . in all matters," including disputes between Roth and Srinivasan. (Compl. at 25.) The Hospital instructed Roth and Srinivasan to form Evergreen, the exclusive provider group corporation. Vakharia states that the exclusive provider contract with Roth and Srinivasan was signed in February 1994. Vakharia contends that the selection of Roth and Srinivasan occurred in violation of the Bylaws and the Hospital Bylaws, as Rao was removed as Department Chair approximately eleven months before her term was set to end.

In March 1994, all anesthesiologists, including Vakharia, were invited to a group meeting to discuss Evergreen's proposed employee contracts with the anesthesiologists. At the meeting, Vakharia realized that all Department members except Vakharia had been given draft employee contracts. The terms of the employee contracts were dictated by the Hospital, and any changes had to be approved by the Hospital. The members were told that they would be replaced if they did not enter into the contracts. Vakharia maintains that the contract violates the Federal Medicare Fraud and Abuse prohibitions and Illinois law.

After the meeting, because she had not been placed on regular rotation, Vakharia complained of discrimination to Roth, McIntyre, Zychlin, Phee, and the other anesthesiologists. Vakharia contends that, in retaliation for her complaint, the Zychlin and the Hospital informed Vakharia that she would not be allowed to practice at the Hospital and that she would not be permitted to use Hospital facilities. Accordingly, Roth did not permit other physicians to refer work to Vakharia.

In April 1994, Vakharia wrote to McIntyre to discuss her situation. She also met with Zychlin. Zychlin informed Vakharia that, according to her file, Vakharia had only "as needed" privileges. Zychlin also told Vakha-

ria that he intended to discuss the matter with Callahan. Zychlin agreed to instruct Roth and Srinivasan to permit Vakharia to work "as needed."

Srinivasan, Armbruster, and McIntyre also met with Vakharia to resolve Vakharia's problem to no avail. They informed Vakharia that Roth and Srinivasan were responsible for all anesthesia scheduling, and that Vakharia could not accept cases referred to her by other physicians. They told Vakharia that she would be terminated if she refused to accept employment with Evergreen on an "as needed" basis. Vakharia was offered a contract with Evergreen as a "backup" anesthesiologist.

Like the Evergreen contract offered to the other anesthesiologists, Vakharia declares that this "backup" contract violates the Federal Medicare Fraud and Abuse prohibitions and Illinois law. Vakharia refused the "backup" contract when her demand to review the Hospital's contract with Evergreen was refused. Zychlin told Vakharia that, although she would retain her Staff membership and clinical privileges, she would not be scheduled absent the contract. According to Vakharia, the Board and the MEC were aware of McIntyre and Zychlin's actions in 1993 and 1994.

Vakharia requested a hearing pursuant to the Bylaws. Phee told Vakharia that, although the Bylaws do not provide for hearings which do not relate to quality of care issues, that Vakharia would be granted a hearing. Vakharia quotes Phee as telling her, "The Hospital had not made any claim that your care has been substandard and specific quality of care problems are not an issue." (Compl. at ·31.) The hearing commenced in June 1994, and was still pending when Vakharia filed her Complaint.

## II. *Procedural Background*

Vakharia alleges eight counts in her Complaint. In Count I, Vakharia contends that all Defendants discriminated against her on the basis of her race, color, and national origin in violation of 42 U.S.C. § 1981. Count II declares that Defendants Roth, Srinivasan, Callahan, McIntyre, Zychlin, Evergreen, the members of the Board and the Hospital discriminated against Vakharia on the basis of her race and national origin in granting an exclusive provider contract for anesthesia services to Evergreen. Count III alleges a conspiracy by all Defendants in their individual capacities to deprive Vakharia of her equal rights as a female Asian under 42 U.S.C. § 1981(a–c) and § 1985(3). Count IV professes that Defendants Roth, Srinivasan, McIntyre, Zychlin, Prout, Callahan, all anesthesiologists, Evergreen, Southwest, the Board and its members, the MEC and its members, and the Hospital violated 15 U.S.C. §§ 1–2 ("the Sherman Act") by forming a conspiracy to monopolize and fix prices for anesthesia services within the Hospital and to restrict Vakharia's practice throughout the United States via a group boycott of Vakharia. Count V maintains that Defendants Roth, McIntyre, the Board, the MEC, the entire Staff, and the Hospital breached a contract in violation of the by-laws. Count VI avouches a violation of 42 U.S.C. § 1985 and 42 U.S.C. § 1986 against Zychlin, McIntyre, Callahan, all anesthesiologists, the Board and its members, the MEC and its 1993–1994 members, and the entire Staff, claiming that those Defendants knew of the harm caused to Vakharia and failed to aid in the prevention of that harm despite an alleged ability to do so. Count VII propounds a claim under 42 U.S.C. § 2000e–2(a)(1–2), (b) and (c) ("Title VII") against all Defendants except Southwest for discrimination in terms and conditions of employment and termination based on color, race, national origin, and sex. Count VIII contends that Vakharia has a claim under 29 U.S.C. § 623(a–c) ("ADEA") against all Defendants except Southwest, stating that all subjected Vakharia to disparate treatment because of her age.

All Defendants have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). They have also moved, in the alternative, for summary judgment on Count V. Furthermore, all Defendants have moved the court to impose Rule 11 sanctions. Vakharia's action against Sister Sharon Ann Walsh was dismissed with prejudice on January 25, 1995, after Vakharia's motion for voluntary dismissal.

III.  *Discussion* [2]

■ On a motion to dismiss, the court takes all well-pleaded factual allegations as true. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund.*, 25 F.3d 417, 420 (7th Cir.1994). The court also accepts as true all reasonable inferences which may be drawn from those allegations. *Triad Assoc., Inc. v. Robinson,* 10 F.3d 492, 495 (7th Cir.1993). A complaint need not specify the correct legal theory nor point to the right statute. *Bartholet v. Reishauer A.G.,* 953 F.2d 1073, 1078 (7th Cir.1992). The court must construe the pleadings liberally, and mere vagueness or lack of detail alone does not constitute sufficient grounds to dismiss a complaint. *McMath v. City of Gary, Ind.,* 976 F.2d 1026, 1031 (7th Cir.1992).

The court notes that Vakharia is represented by counsel. Therefore, her Complaint does not command the exceptional tolerance accorded to *pro se* pleadings. *See Smith v. United States Dist. Ct. for the Southern Dist. of Ill.,* 956 F.2d 647, 649 (7th Cir.1992).

The court is also mindful of the Seventh Circuit's recent declaration that "[h]ospitals are not public utilities, required to grant staff privileges to anyone with a medical license." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,* 65 F.3d 1406, 1413 (7th Cir.1995). "The proper exercise of medical judgment in the best interests of patients is of critical importance to society, and court must not overlook that consideration in arriving at a proper resolution in disputes such as this." *Gomez v. Allegheny Health Serv.,* 71 F.3d 1079, 1085 (3d Cir.1995).

*A.  Discrimination Claims*

In essence, Counts I and II state that all Defendants interfered with Vakharia's right to contract with patients by delaying her application and granting Evergreen's contract because of Vakharia's race. Count III alleges that all Defendants engaged in a conspiracy to deprive Vakharia of her equal rights as a female Asian in violation of 42 U.S.C. § 1981(a–c) and § 1985(3).[3] Count VI alleges that Zychlin, McIntyre, Callahan, all anesthesiologists, the Board and its members, the MEC and its 1993–1994 members, and the entire Staff violated § 1985 and § 1986 by knowing of, and failing to prevent, the harm caused to Vakharia despite their ability to do so. Counts VII and VIII allege a Title VII race, national origin, and gender discrimination claim as well as an ADEA claim against all Defendants.

■ Courts analyze § 1981 claims in the same manner as claims brought under Title VII and the ADEA. *Bratton v. Roadway Package System, Inc.,* 77 F.3d 168, 175–76 (7th Cir.1996). Accordingly, the court will address Counts I, VII, and VIII together, before addressing conspiracy claims.[4]

1.  Statute of Limitations

■ Defendants argue that Vakharia's attempt to state a claim for relief from discrimination based upon her initial application is time barred. State law provides the limitations statutes for § 1981 claims; Illinois law provides for a two-year limitations period. *Vakharia v. Swedish Covenant Hosp,* 824 F.Supp. 769, 774 (N.D.Ill.1993). That

---

2. At this juncture, the court deems it fit to note that Vakharia's responsive pleadings lack structure, relevance, and attention to grammatical rules. They are replete with statements like the following: "Although all individuals in the department were on a fee for service private practice basis (which means that the patient not the hospital pays the anesthesiologoists [sic] bills) Complaint para 22, and the equal sharing of case loads in the department continued on that basis, Complaint para 24, until possible change by a sole provider contract with Evergreen which became effective April 11, 1994, Complaint para 106–120." (Pl.Resp.Mot.Dismiss at 11) (citation omitted). The court admonishes Vakharia for her perfunctory approach to argument.

3. The court notes that § 1981 does not provide a claim for gender discrimination. *Bratton v. Roadway Package Sys. Inc.,* 77 F.3d 168, 176–77 (7th Cir.1996).

4. Defendants argue that Vakharia may not base her claims on any delay which may have occurred in the processing of her applications. The court disagrees. Just as "justice delayed *is* justice denied," *Schroeder v. City of Chicago,* 927 F.2d 957, 960 (7th Cir.1991), employment delayed may be employment denied. "At some point delay must ripen into deprivation, because otherwise a suit alleging deprivation would be forever premature." *Id.* (holding that fire fighter could state a claim for relief for delay in denial of disability benefits).

period begins to run when a plaintiff knows or should know of the facts supporting her discrimination charge, rather than when the consequences of the discrimination become painful. *Asllani v. Board of Ed.*, 845 F.Supp. 1209, 1224 (N.D.Ill.1993).

Vakharia contends that denial of the first application occurred as part of a continuing violation. Courts may not apply a theory of continuing violation, which expands the limitations period, where each of the alleged discriminatory actions is a discrete, open act by defendants. *Jones v. Merchants Nat'l Bank & Trust Co. of Indianapolis*, 42 F.3d 1054, 1058 (7th Cir.1994). In the instant case, Vakharia may not have been aware of the alleged discrimination in the processing of her first application, which occurred as the first of several alleged acts of discrimination. The action upon her first application was not a discrete, open act, which would be expected to notify Vakharia of discrimination. *See Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 281–82 (7th Cir.1993). Accordingly, at this stage of the litigation, the court views Vakharia's claims as based on a continuing violation which occurred within the statute of limitations.

### 2. EEOC Preconditions

As a threshold matter, the court discusses the issue of compliance with Equal Opportunity Employment Commission ("EEOC") filing requirements for Title VII and ADEA claims. Congress directs that a party suing for discrimination must file charges with the EEOC before proceeding with a Title VII or ADEA claim in federal court. *See* 42 U.S.C. § 2000e–5(f)(1) (Title VII); 29 U.S.C. § 626(d) (ADEA). Parties not named in a charge already filed with the EEOC may not be sued under Title VII or the ADEA unless that party had adequate notice of the charge and was given opportunity to participate in conciliation proceedings.

*Vakharia v. Swedish Covenant Hosp.*, 824 F.Supp. 769, 774 (N.D.Ill.1993).

The copy of Vakharia's charge, submitted with her responsive pleadings, names only the Hospital as the perpetrator of discrimination. Vakharia states that her EEOC "intake questionnaire" sufficiently notified all Defendants of the charges against them. Vakharia completed the questionnaire by referring the reader to a copy of her Complaint for the names of the discriminators. The court finds that this questionnaire does not serve as a "charge" for purposes of notifying Defendants. *See Jones v. United Air Lines*, No. 94 C. 4506, 1995 WL 491497, at *4 (N.D.Ill. Aug. 14, 1995) (holding that the job applicant had not satisfied EEOC filing preconditions where defendants were named in several EEOC questionnaires describing alleged discrimination, but not in an official "charge").[5] Accordingly, Vakharia has not complied with the EEOC requirements in filing her Title VII and ADEA charges against any Defendant except the hospital.

Vakharia correctly states that EEOC requirements are subject to the principles of equitable tolling and waiver. *See Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 151, 104 S.Ct. 1723, 1725–26, 80 L.Ed.2d 196 (1984). However, Vakharia fails to offer the court any justification for invoking such principles. Interestingly, Vakharia argues (not surprisingly without citation) that whether those principles apply is a question of fact not properly addressed at the motion to dismiss stage. In short, Vakharia argues that the court must wait until the summary judgment phase of this litigation to decide a threshold procedural issue. The court rejects this argument and finds that the EEOC preconditions were neither waived nor do they warrant equitable tolling.[6] Also, although given ample opportunity both in her EEOC supplemental submission and at oral argument, Vakharia does not argue that her EEOC charge constructively put all parties

---

5. The court notes that, in 1993, Vakharia and her attorney were alerted to their previous failure to follow EEOC requirements in another case filed by Vakharia. *Vakharia v. Swedish Covenant Hosp.*, 824 F.Supp. 769 (N.D.Ill.1993).

6. The Seventh Circuit has "made it clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point." *Doe v. Johnson*, 52 F.3d 1448, 1457 (7th Cir.1995).

on notice of her claims by notifying the Hospital. *See, e.g., Cassano v. DeSoto, Inc.,* 860 F.Supp. 537 (N.D.Ill.1994) (corporate officers could be sued despite failure to name them in EEOC charge).[7]

Vakharia was represented by counsel at the EEOC filing stage. Vakharia and counsel were responsible for assuring the propriety of the charge filed before the EEOC. "One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Id.* Accordingly, Vakharia's Title VII and ADEA claims must be dismissed against all parties except the Hospital.

3. Allegations of Discrimination

■■■ To state a claim under § 1981[8], Title VII, or the ADEA, Vakharia must allege either (1) direct evidence demonstrating that race was a factor in the challenged employment action, or, alternatively, (2) a prima facie case of race discrimination. *See McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686 (7th Cir.1991). Vakharia alleges that Roth played a role in the Hospital's decisions about her privileges. She also states that Roth commented that he intended to eliminate female Asians from the Department. Accordingly, regarding the Hospital's decisions about her privileges, she states a claim § 1981 claim for race discrimination, and a gender and race discrimination claim under Title VII with direct evidence. *See, e.g., McNeil v. Economics Lab., Inc.,* 800 F.2d 111, 115–16 (7th Cir.1986) (where employee alleged that supervisor-decisionmaker stated intention to get rid of "old salesmen," employee had directly alleged claim for age discrimination).

■■■ However, Vakharia has not stated such a direct case of race or gender discrimination regarding the Hospital's selection of Evergreen as an exclusive provider. Roth is the only Defendant directly alleged to have acted out of illegal discriminatory animus. Vakharia does not allege that Roth participated in the selection of Evergreen on behalf of the Hospital. Despite Roth's com-ments, stray remarks are direct evidence of intent only where they are made by a decisionmaker and are related directly to the employment decision in question. *McCarthy v. Kemper Life Ins. Cos.,* 735 F.Supp. 251, 253 (N.D.Ill.1989). Statements by employees do not demonstrate an employer's intent to discriminate, even when the decisionmaker consults with those employees in reaching its decision. *Aungst v. Westinghouse Elec. Corp.,* 937 F.2d 1216, 1221 (7th Cir.1991). Although unfortunate, bigotry is not itself actionable unless it causes injury to the plaintiff. *Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1004 (7th Cir.1994). As Roth merely played the role of a co-employee in the Evergreen selection process, Vakharia has not directly stated a claim for discrimination in the process of selecting Evergreen. Also, unlike the employee in *McNeil,* Vakharia has not directly established age discrimination.

■■■ Alternatively, Vakharia attempts to state a prima facie case for her remaining discrimination claims. To state a prima facie case, Vakharia must allege (1) that she is a member of a protected class, (2) that she applied and was qualified for the position she sought, (3) that she did not receive the position, and (4) that the position was granted to a person who was not a member of the protected class. *Smith v. Cook County,* 74 F.3d 829, 831 (7th Cir.1996).

■■■ As to the selection of Evergreen as an exclusive provider, Vakharia does allege that she was a member of a protected class (female Asian), that she applied for a position as Department Chair and leader of an exclusive provider group, and that the position was granted to a person who was not a member of the protected class (Roth, a white male). However, Vakharia does not allege that she was qualified for the position. She does not allege that, like Roth, she had experience as a Department Chair or that she had even attempted to form a group. Indeed, she states that she intended to main-

---

7. The court notes that such an argument would be difficult to reconcile with her contention that all parties are so separate that they are not subject to intracorporate immunity.

8. Vakharia's general assertion under § 1981 is that the Defendants interfered with her ability to make contracts with patients because of her race.

tain the very status quo which the Hospital's exclusive provider program was intended to modify. Accordingly, Vakharia has failed to state a claim of race and gender discrimination in the process of selecting Evergreen.

■ Regarding age discrimination, Vakharia does allege that she is over 40, that she sought and was qualified for a position as an anesthesiologist with full privileges on active rotation, and that she did not receive such a position. She does not allege, however, that a younger person received such a position. Although she alleges that Krause was "young," she fails to state that he received the position sought by Vakharia. She states that Krause was only allowed to practice in the Surgical section for a short time (as opposed to practicing in both the OB/GYN and Surgical sections permanently, the position sought by Vakharia). She also does not allege that Roth, who received the position as Department Chair and leader of the exclusive provider group, was younger than Vakharia. Accordingly Vakharia has failed to state a *prima facie* case under the ADEA and Count VIII must be dismissed.

In sum, Counts I, II, and VII remain to the extent they refer to the process of granting Vakharia's privileges. Count VIII is dismissed.

#### 4. Parties

Vakharia has sued over 500 people in her complaint. As discussed above, the court considers only the Hospital as a Defendant to her remaining Title VII claim.

■ Even if Vakharia had named all Defendants in the EEOC charge, the court would dismiss her Title VII and ADEA claims against all Defendants except for the Hospital and Evergreen. All Defendants named in these counts were employees or supervisors for the Hospital or Evergreen. Vakharia impudently refuses to concede the failure of these claims in light of recent Seventh Circuit decisions.

"[A] supervisor does not, in his individual capacity, fall within Title VII's definition of employer." *Williams v. Banning,* 72 F.3d 552, 554 (7th Cir.1995). In both *Banning,* and its predecessor, *United States E.E.O.C. v. AIC Security Investigations, Ltd.,* 55 F.3d

1276 (7th Cir.1995), the Seventh Circuit emphasized the similarity of supervisor liability analysis in both Title VII and ADEA cases. *See Banning,* 72 F.3d at 554, *AIC,* 55 F.3d at 1282 n. 10 (holding that supervisors are not individually liable under the Americans with Disabilities Act ("ADA")). The Seventh Circuit has not, however, directly stated that individual supervisors are free from liability under the ADEA.

In *AIC* and *Banning,* the Seventh Circuit noted that, in creating liability schemes which run only to employers having more than fifteen employees, Congress protected small employers with limited resources. *AIC,* 55 F.3d at 1281, *Banning,* 72 F.3d at 553. In comparison, the ADEA applies only to employers having twenty or more employees. 29 U.S.C. § 630(b). In *AIC* and *Banning,* the Seventh Circuit determined that, having so excluded small employers from liability, Congress could not have intended to impose liability against individual employees. *See Banning,* 72 F.3d at 553. The ADEA, Title VII and the ADA use essentially identical definitions of "employer." *Banning,* 72 F.3d at 553. In reaching the *AIC* and *Banning* decisions, the Seventh Circuit was persuaded by the reasoning of ADEA cases. *AIC,* 55 F.3d at 1280. Accordingly, the court anticipates that the Seventh Circuit would also refuse to find individual supervisor liability under the ADEA. Having refused supervisory liability, the court is also confident that the Seventh Circuit will refuse individual co-employee (staff members) or agency (attorney Callahan) liability. Individual employees, not otherwise qualifying as employers, cannot be liable under Title VII or the ADEA.

Therefore, the court would reject Vakharia's claims against the individuals in her Title VII and ADEA counts. Additionally, as Evergreen was never, by her own allegations, Vakharia's employer, it cannot be liable to her under Title VII and the ADEA.

However, § 1981 does not contain the Title VII and ADEA discussion of employer liability. It extends to all who may violate equal rights. Accordingly, the court will consider Vakharia's § 1981 claim as to all parties.

Vakharia alleges in Count I that all Defendants interfered with the formation of her contracts with individual patients. Under § 1981 analysis, the relationship between a plaintiff and an interferer is irrelevant; if an interference impedes the formation of a contract, it is covered by § 1981. *Vakharia v. Swedish Covenant Hosp.,* 765 F.Supp. 461, 471 (N.D.Ill.1991). Vakharia fails, however, to even allege how many of the Defendants could have possibly interfered with those contracts.

For purposes of a motion to dismiss, Vakharia does allege § 1981 discrimination by McIntyre, Zychlin, Roth, and the Board members (to the extent that those individuals were present and in existence at the Hospital when the alleged discrimination occurred) in that she alleges that they participated in the denial of her privileges for racial reasons by delaying her application and refusing to schedule her. As agents, these parties may subject the Hospital and Evergreen (to the extent that it existed during the latter part of the alleged discrimination) to liability.

However, although these parties may have interfered with Vakharia's contracts, and the Hospital may be liable for that interference by its agents, Vakharia cannot extend that liability to everyone and everything associated with the Hospital. "Corporate officers' decisions may be imputed to the corporation; things do not work the other way 'round." *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.,* 77 F.3d 928, 933 (7th Cir. 1996).

For instance, Vakharia only refers to Southwest in passing, and she sets forth no information indicating that Southwest could have interfered with her contracts. Indeed, at most, she argues that "the proposed role for Southwest was the eventual role that Evergreen assumed." (Pl. Resp. Southwest Mot. Dismiss at 2.) Vakharia does not allege that Southwest ever acted in any way, much less in a way that harmed Vakharia. Thus, it cannot be liable under § 1981. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 563–64, 112 S.Ct. 2130, 2138, 119 L.Ed.2d 351 (1992) (plaintiff must establish that she has suffered a concrete, distinct, and actual injury, not one that is merely conjectural or hypothetical).

Even more absurd is Vakharia's allegation that Callahan, an attorney allegedly retained by the Hospital in June 1993, was responsible for any acts relating to the processing of her application in August 1992. Vakharia states only that Callahan was responsible for the process of selecting Evergreen, not that he had any responsibility in the decisions about granting her privileges. Her allegation that Callahan once told her, years before the alleged discrimination, that he intended to stop her from practicing, fails to demonstrate a racial motive and resulting discriminatory act on Callahan's part. Accordingly, Callahan cannot be held responsible for any discrimination which occurred in the granting of Vakharia's privileges. As discussed above, Vakharia has not stated even a *prima facie* case of discrimination in the selection of Evergreen; therefore, Callahan is also not liable for his actions in the selection of Evergreen. Thus, she has not alleged a cause of action against Callahan for discrimination.

In addition, Vakharia fails to state a § 1981 claim for individual liability against Srinivasan. Vakharia states that Srinivasan was responsible for scheduling at Evergreen, but does not allege that he played any role in any racial discrimination which may have occurred in the granting of Vakharia's privileges, or that he was capable of doing so.

Furthermore, Vakharia has not stated a claim against Prout, Phee, Armbruster, or the MEC. She alleges simply that they were in agreement with Roth to discriminate against her. She sets forth absolutely no information demonstrating any such agreement, and no actions taken by these Defendants which would manifest its existence.

Vakharia also asserts a cause of action against various anesthesiologists, including Lee, Subramanian, J. Yu, Carpo, Cadayona, M. Yu, and J. Skirnyk. Vakharia's only allegation regarding these Defendants is her statement that, as members of the Department, they recommended the approval of Vakharia's application for privileges. In no way does this allegation lead to an inference

that these Defendants interfered with Vakharia's contracts with patients, much less that they were in any way involved in discrimination against Vakharia.

■ Most egregious is Vakharia's contention that the entire medical staff engaged in discrimination against her. She makes no contention that the 500 physicians on the Staff played any role in the Hospital's decisions about Vakharia's privileges. Vakharia fails to directly respond to the Staff's motion to dismiss and states only that she relies on her other responses to serve as her argument against dismissing the staff.

In her memorandum in opposition to the multiple motions to dismiss, without relevant citation, Vakharia alleges that the Hospital functioned in the capacity of a union hall, and the Medical Staff like the Union in granting privileges to practice at the Hospital. The court rejects this analogy. There are no allegations in the Complaint indicating that the Staff is anything other than a division of the Hospital. Furthermore, Vakharia affirmatively states that only the Department, the Credentials Committee, the MEC, and the Board had any part in the privileges decisions. As such, Vakharia has not alleged any interference with Vakharia's contracts by the Staff, much less any racially motivated interference.

■ Legal conclusions are never adequate to plead a viable claim for relief. *See Ill. v. Roland,* 812 F.Supp. 855, 862 (N.D.Ill. 1993). Although the standards for dismissal are liberal, notice pleading standards do not allow plaintiffs, much less attorneys, to shoot first and ask questions later. *See Magnus Elec. v. Masco Corp. of Ind.,* 871 F.2d 626, 629 (7th Cir.1989).

In conclusion, Vakharia has stated a Title VII race and gender discrimination claim against the Hospital regarding the denial of privileges. She has stated a § 1981 race

discrimination claim against McIntyre, Zychlin, Roth, the Board members, the Hospital, and Evergreen, to the extent that those individuals were present and in existence when the alleged discrimination occurred. Accordingly, Count II (§ 1988) stands against only Roth, McIntyre, Zychlin, the Board members, the Hospital and Evergreen to the same extent as the § 1981 claims.

5. Discriminatory Conspiracy Claims

Counts III and VI allege discrimination in violation of § 1985 and § 1986. Count III declares that each Defendant, individually, conspired to deprive Vakharia of her equal rights as a female Asian under § 1981 and § 1985(3).[9] Count VI states that, in violation of § 1985 and § 1986, Zychlin, McIntyre, Callahan, all anesthesiologists, the Board and its members, the MEC and its 1993–1994 members, and the entire Staff knew of the harm caused to Vakharia and failed to prevent it, despite an alleged power to do so.[10]

■ To state a claim under § 1985(3), Vakharia must allege that (1) two or more parties conspired, (2) with the purpose of denying, directly or indirectly, equal protection of the law, (3) an act in furtherance of the conspiracy, and (4) that such an act injured a person or his property. *Scott v. Sisters of St. Francis Health Serv.,* 645 F.Supp. 1465, 1471 (N.D.Ill.1986), *aff'd* 822 F.2d 1090 (7th Cir.1987). Moreover, Vakharia must specifically allege racial or other discriminatory animus behind the alleged conspiracy. *See Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). Conclusory allegations are insufficient. *Id.*

The purpose requirement of § 1985(3) "demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must at least act in part for the very purpose of producing it." *Bray v. Alexan-*

9. It is unclear whether § 1985 provides relief for gender discrimination. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 266–68, 113 S.Ct. 753, 758, 122 L.Ed.2d 34 (1993). As Defendants have not argued against the inclusion of gender discrimination in Vakharia's § 1985 claim, the court will not address the issue at this juncture.

10. Vakharia has not named the entities of the Board or the MEC as defendants. Accordingly, her allegations will be considered only as they run to the members of those groups.

*dria Women's Health Clinic,* 506 U.S. 263, 276, 113 S.Ct. 753, 763, 122 L.Ed.2d 34 (1993). Vakharia has specifically asserted no such purpose on the part of anyone except Roth, who was an agent of the Hospital, Southwest, and Evergreen.

Also, the Hospital argues that, as a corporation, it could not have been a member of the alleged conspiracy. A corporation cannot conspire with itself. *Travis v. Gary Comm. Mental Hlth. Ctr, Inc.,* 921 F.2d 108, 110 (7th Cir.1990). Because a corporation is capable of acting only through its officers, directors, and agents, the intracorporate immunity doctrine dictates that a corporation is incapable of conspiring with those designated who act on its behalf. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The *Copperweld* doctrine extends to claims brought under § 1985. *Hartman v. Board of Trustees of Comm. Coll. Dist. No. 508, Cook County, Ill.,* 4 F.3d 465, 469 (7th Cir.1993); *Travis v. Gary Comm. Mental Health Ctr. Inc.,* 921 F.2d 108 (7th Cir.1990).[11] In *Travis,* the Seventh Circuit concluded that not even a meeting between outside counsel and corporate executives prior to firing an employee could constitute the concerted action necessary for a § 1985 claim. *Id.* at 111. *See also Vakharia v. Swedish Covenant Hosp.,* 824 F.Supp. 769, 778 (N.D.Ill.1993).

The fact that some of the alleged conspirators held an economic stake in the decisions about Vakharia does not separate those conspirators sufficiently to create conspiracy liability on the part of the Hospital. *See Terry v. Atlas Van Lines, Inc.,* 679 F.Supp. 1474, 1477 n. 4 (N.D.Ill.1987) (corporate board member who had competitive stake in board's decision could not have conspired with corporation to violate civil rights law).

Vakharia has not alleged that Roth, or any of the other individual Defendants, acted in any capacity other than as agents, employees, or officers of the Hospital, Southwest, or Evergreen. She does not allege any

racial discrimination that could have harmed her in connection with Southwest. She does argue, however, that Evergreen and the Hospital were separate entities, capable of conspiring with each other for purposes of § 1985. Indeed, Illinois law provides that only physicians may own service corporations such as Evergreen; it follows that the Hospital cannot be the parent corporation of Evergreen for purposes of combining the two under the *Copperweld* doctrine. Illinois Service Corporation Act, 805 ILCS 10/8. Accordingly, Evergreen and the Hospital stand as parties to Vakharia's § 1985 conspiracy claim. The court notes that Evergreen did not exist until November 1993. Accordingly, there could not have been a conspiracy between the Hospital and Evergreen until after that time.

Still, the court does not find that each allegation in the Complaint falls within the reach of a § 1985 claim. Again, Vakharia has not alleged discrimination in the selection of Evergreen.

Also, Vakharia's allegations regarding the eventual termination of all of her privileges do not state a claim of discrimination. Vakharia states that Evergreen offered her only an "as needed" contract (as opposed to the full privilege contract offered to other anesthesiologists) because of her race and gender. However, she states that she refused to sign her "as needed" contract because it was illegal, as it violated Federal Medicare Fraud and Abuse prohibitions. She states that the same illegality existed in the full privilege contract. It follows that, even if Evergreen had offered her the full privilege contract, that Vakharia would not have signed it, because it was also "illegal." Vakharia alleges, in essence, that Evergreen discriminated against her by not offering her an illegal contract. The law will not protect Vakharia from the loss of an illegal opportunity, regardless of whether racial discrimination caused that loss.

Further, Vakharia states that her eventual loss of her partial privileges sprang from her refusal to sign a contract with Evergreen,

---

**11.** Vakharia argues that the *Copperweld* doctrine does not apply outside of the antitrust context. This argument, in the face of repeated straight-forward Seventh Circuit rulings to the contrary, indicates Vakharia's failure to research her arguments. *See Hartman,* 4 F.3d at 469.

not from discrimination. Thus, Vakharia does not state a § 1985 violation based on that loss of partial privileges.

In sum, Vakharia has stated a § 1985 claim against the Hospital and Evergreen running from November 1993 and going to the denial of her full privileges because of her race and gender until the time that all of her privileges were terminated for failure to sign the contract. To the extent that her § 1985 claims survive, Vakharia's § 1986 claims survive against the same parties and regarding the same conduct. *See Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 203 (7th Cir.1985) (§ 1986 require predicate § 1985 claims); *Chicago Miracle Temple Church, Inc. v. Fox,* 901 F.Supp. 1333, 1348 (N.D.Ill.1995).

### B. Antitrust

Vakharia attempts to fit the square peg of her dispute with the Hospital into the round hole of federal antitrust law. To state a claim under § 1 of the Sherman Act, Vakharia must have alleged a contract, combination, or conspiracy imposing unreasonable restraint on trade. *See BCB Anesthesia Care, Ltd. v. Passavant Mem. Hosp. Assn.,* 36 F.3d 664 (7th Cir.1994). Vakharia's antitrust claim is subject to "rule of reason," rather than "per se," analysis; "per se" analysis applies only where "the likelihood of anticompetitive conduct [is] so great as to render unjustified further examination of the alleged conduct." *Business Elecs. Cop. v. Sharp Elecs. Corp.,* 485 U.S. 717, 724, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988) (citation omitted). The situation described by Vakharia warrants further examination.

█ It is not enough for Vakharia to allege that she has been injured. *See Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983). She must have suffered an antitrust injury. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 31, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984). An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1419 (7th Cir.1989) (quoting *NCAA v. Bd. of Regents of the Univ. of Okla.,* 468 U.S. 85, 103, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984)). The alleged injury must be palpable and distinct, rather than abstract, conjectural or hypothetical. *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1296 (7th Cir.1993).

█ Vakharia must also establish that the Defendants had market power; that is, there must be a showing that Defendants possessed the "power to raise prices significantly above the competitive level without losing all of one's business." *See, e.g., Jefferson Parish Hosp.,* 466 U.S. at 34, 104 S.Ct. at 1569–70 (1984) (finding an absence of anticompetitive effect in a market including at least twenty hospitals in New Orleans); *Ezpeleta v. Sisters of Mercy Health Corp.,* 800 F.2d 119 (7th Cir.1986). Furthermore, Vakharia has the burden of showing that the antitrust violation had a negative effect on competition in a relevant market. *Tunis Bros. Co. Inc. v. Ford Motor Corp.,* 952 F.2d 715 (3d Cir.1991). To hold otherwise would transform ordinary business disputes into antitrust claims. *See Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1338 (7th Cir.1986).

█ In Count IV, Vakharia asserts that Roth, Srinivasan, all anesthesiologists, McIntyre, Zychlin, Prout, Callahan, Evergreen, Southwest, the Board and its members, the MEC and its members, and the Hospital conspired to monopolize anesthesia services throughout Chicago and the United States and to restrict Vakharia's anesthesia services via a group boycott. Vakharia alleges that a substantial amount of interstate commerce is involved in the provision of those services. Vakharia generally alleges that the "conspirators" entered into a contract, combination or conspiracy to prevent Vakharia from acquiring full privileges, and that they have performed acts and made statements in continuance thereof. She states that the delay in the processing of her application and the failure to place her on regular rotation constituted a group boycott of Vakharia's anesthesia services. Further, she states that Roth and Evergreen had a monopoly on pa-

tient assignments and used that monopoly to maximize charges, eliminating competition within the Hospital.[12]

Vakharia has failed to allege that any "conspiracy" had a negative effect on competition in a relevant market. She generally states that the conspirators intended to effect competition in Chicago and throughout the nation, but she fails to assert a palpable injury to competition in that market. Moreover, Vakharia does not even attempt to declare that the conspirators had market power in the whole Chicago market, much less in the national market.

■ Although Vakharia states that competition was restricted within the Hospital, one hospital's staffing decision cannot give rise to a § 1 claim. *BCB Anesthesia Care, Ltd. v. Passavant Mem. Hosp. Assn.*, 36 F.3d 664, 668 (affirming dismissal of a § 1 claim based on a hospital's termination of plaintiffs nurse-anesthetists' exclusive provider contract).[13] Vakharia alleges nothing more than problematic staffing decisions at a single hospital. Accordingly, she has not stated a claim under § 1.

Furthermore, although the Seventh Circuit only recently stated that a single hospital's staffing decision does not give rise to a § 1

Sherman Act claim in *BCB*, it has long since determined that a § 2 claim will also not lie in such a case. *See, e.g., Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473 (7th Cir. 1988) (exclusive provider contract did not violate § 2 of the Sherman Act). Accordingly, Vakharia has not stated a § 2 claim.

In conclusion, Vakharia has failed to allege antitrust injury, market power, or a relevant market. Injecting the powerful medicine of the Sherman Act into Vakharia's staffing dispute would be like treating a hangnail with amputation of the finger.

### C. Breach of Contract and Bylaws

■ In Count V, Vakharia attempts to set forth a claim for breach of contractual rights accorded in the Bylaws. She names in this count Roth, McIntyre, the Board, the MEC, the entire Staff, and the Hospital.[14] Vakharia alleges that these Defendants violated the Bylaws by failing to process her application for full privileges, by granting her only partial privileges, by not placing Vakharia on regular rotation after she was accorded full privileges, and by entering the exclusive provider contract with Roth and Evergreen.[15]

---

**12.** Mysteriously, Vakharia also alleges that the "as needed" contract offered to her by Evergreen, which she never signed, "could" have resulted in the "national blackballing" of Vakharia because it permitted the Hospital to report to state and federal authorities Vakharia's failure to provide the level of compassion due a patient. (Compl. at 41.) The anesthesiologist Defendants argue that such a potential illegality does not give rise to a cognizable § 1 claim.

In response, Vakharia states: "With respect to competition in the provision of anesthesia services in the national market, such unilateral contract rights to label an Anesthesiologist 'guilty of patient mistreatment' would given [sic] an impenetrable shield to sole source providers with contracts at one or more hospitals in any local area of competition. A slave owner in ancient Rome would be proud of the control provided, for such an owner could ban a slave or freeman from the civilized world (of medicine) permanently without any legal recourse for either the slave or freeman. If all slave owners had such power, the increase in such owners [sic] power would be obvious." (Pl.Resp.Staff Anesthesiologists' Mot.Dismiss at 6.)

Nevertheless, Vakharia fails to allege that she was even a party to such a contract, much less a victim of slave trade. Vakharia's imaginary pa-

rade of horribles is not actionable in federal court.

**13.** Even if Vakharia had alleged such a conspiracy, for the reasons stated in the conspiracy section, *supra,* that conspiracy could only have existed between the Hospital and Evergreen.

**14.** Again, Vakharia has named neither the Board nor the MEC as entities, only their individual members. Accordingly, the court will consider Count V against the members.

**15.** Attaching copies of the Bylaws, the Staff bylaws, and the Rules, Defendants ask the court to rule, as a matter of law, on Count V. If, on a *motion to dismiss for failure to state a claim,* matters outside the pleadings are presented to and not excluded by the court, the motions shall be treated as if for summary judgment and disposed of as provided in Rule 56. Fed.R.Civ.P. 12(b). When considering materials outside the pleadings, it is in the court's discretion to characterize a motion as one for summary judgment. *See St. Paul Ins. of Bellaire v. AFIA Worldwide Ins.,* 937 F.2d 274, 277 (5th Cir.1991). In the instant case, the court declines to characterize Defendants' motion as such, given the factual

At the outset, the court recognizes the limited scope of judicial review of hospital staffing decisions. "Illinois cases have repeatedly recognized that decisions of private hospitals respecting the termination or curtailment of existing privileges of physicians on their medical staffs are subject only to a limited judicial review whose purpose is merely to determine whether such decisions were rendered in compliance with the bylaws of the institution." *Garibaldi v. Applebaum,* 273 Ill.App.3d 536, 538, 210 Ill.Dec. 455, 653 N.E.2d 42 (1st Dist.1995) (quoting *Knapp v. Palos Community Hospital,* 176 Ill.App.3d 1012, 1018–19, 126 Ill.Dec. 362, 531 N.E.2d 989 (1989)); *Adkins v. Sarah Bush Lincoln Health Center,* 129 Ill.2d 497, 506–07, 136 Ill.Dec. 47, 544 N.E.2d 733 (1989). In *Barrows v. Northwestern Mem. Hosp.,* 123 Ill.2d 49, 121 Ill.Dec. 244, 525 N.E.2d 50 (1988), the Illinois Supreme Court declined to extend judicial review the process of application for privileges, despite the physician's argument that the bylaws provided a right to a hearing. *Id.* at 121 Ill.Dec. at 246–49, 525 N.E.2d at 52–55.

■ Consequently, the court must limit its analysis to the question of whether the Hospital followed its bylaws in the process of terminating Vakharia's existing privileges, rather than whether it did so in making its decision to extend privileges for the first time. As such, Vakharia cannot base a breach of contract and bylaws claim on the initial granting of new partial privileges, or failure to process her application for new, full privileges. However, to the extent that failure to place Vakharia on full rotation rescinded the full privileges eventually granted to Vakharia, she may state a breach of contract and bylaws claim.

■ As to the exclusive provider contract, the court acknowledges that hospitals do have the right to enter such agreements. That right is not dependent upon the bylaws of the hospital. Regardless of the right, though, when entering exclusive provider agreements, hospitals may breach contracts already accorded to physicians under bylaws. *Garibaldi v. Applebaum,* 273 Ill.App.3d 536,

538, 210 Ill.Dec. 455, 653 N.E.2d 42 (1st Dist.1995); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 481 (7th Cir.1988). A hospital's bylaws may form an integral part of a separate contractual relationship with members of its medical staff. *Id.* That contractual relationship may be breached if it is terminated by the institution of an exclusive provider agreement. Although tenuously, Vakharia does allege that she acquired contractual rights under the Bylaws through interim privileges, and that those rights were breached when the Hospital entered the exclusive provider arrangement with Evergreen.

The question then becomes whether each of the Defendants named in Count V may be liable for breach of Vakharia's alleged contractual rights. Vakharia makes no allegation that McIntyre, Roth, or the individual Board or MEC members were parties to any contract between the Hospital and the Staff which was embodied in the Bylaws. As such, she has not pleaded a viable breach of contract and bylaws claim against them. Furthermore, Vakharia has pleaded nothing indicating that the Staff did anything which could constitute breach of her contractual rights under the Bylaws. Accordingly, she cannot sue the Staff for breach of contract and bylaws. Vakharia has, however, pleaded a viable breach of contract and bylaws claim against the Hospital, in that she states that the Hospital violated her contractual rights when it entered an exclusive provider contract with Evergreen.

### E. *Rule 8*

■ Rule 8 of the Federal Rules of Civil Procedure requires complaints to set forth "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and mandates a plaintiff to insure that each averment of her pleading is "simple, concise, and direct," Fed.R.Civ.P. 8(e)(1). *Industrial Specialty Chemicals, Inc. v. Cummins Engine Co., Inc.,* 902 F.Supp. 805 (N.D.Ill.1995). Failure to follow Rule 8 may warrant dismissal. *Hartz v. Friedman,* 919 F.2d 469, 471 (7th Cir.1990); *Industrial Specialty Chems., Inc. v. Cummins Engine Co., Inc.,* 902 F.Supp. 805, 814 (N.D.Ill.1995).

disagreements over which documents are relevant. *See* Fed.R.Civ.P. 56(f).

Under federal notice pleading standards, the short, plain statement need not plead particulars, but must merely allege facts sufficient to put defendants on notice of the claims asserted against them.

But if a plaintiff does plead particulars, and they show that he has no claim, then he is out of luck—he has pleaded himself out of court. *Early v. Bankers Life & Casualty Co.,* 959 F.2d 75, 78 (7th Cir. 1992); *Conn v. GATX Terminals Corp.,* 18 F.3d 417, 419 (7th Cir.1994); *Fryman v. United States,* 901 F.2d 79, 82 (7th Cir. 1990). He is not saved by having pleaded a legal conclusion that if consistent with the facts would establish his right to relief, for he has shown that it is inconsistent with the facts. *Benson v. Cady,* 761 F.2d 335, 338 (7th Cir.1985); *Jones v. Morris,* 777 F.2d 1277, 1280 n. 5 (7th Cir.1985). *Thomas v. Farley,* 31 F.3d 557, 558 (7th Cir.1994). As discussed above, Vakharia has done so with regard to several of her claims.

Nevertheless, Vakharia presses that courts should prefer "specific" complaints, such as hers, rather than adhering to federal notice pleading standards. (Pl.Resp.Mot.Dismiss at 36.) The court disagrees.

Vakharia has not complied with Rule 8's "short and plain" requirement. In the instant case, the court finds itself drowned in Vakharia's hardly "short" fifty-one pages and far from "plain" 178 paragraphs of "specifics." The Complaint is waterlogged with facts which are of no apparent relevance and void of many facts essential to Vakharia's purported claims.[16] Accordingly, the court dismisses the remainder of the Complaint without prejudice for failure to comply with Rule 8.

### IV. *Conclusion*

Accordingly, Vakharia's claims are dismissed with prejudice, with the following exceptions: Counts I and II remain against McIntyre, Zychlin, Roth, the Board members, the Hospital and Evergreen; Count III remains against the Hospital and Evergreen; Count V remains against the Hospital; Count VI remains against the Hospital and Evergreen; and Count VII remains against the Hospital, all of which are dismissed without prejudice. The court reserves ruling on the issue of Rule 11 sanctions until the parties have completed the previously-ordered supplemental briefing.

IT IS SO ORDERED.

---

16. For example, Vakharia details changes in the anesthesia staff (stating when various specific physicians retired or left the Hospital), complaints about anesthesia scheduling shortages, and problems that various anesthesia staffing conflicts (for example, explaining that one anesthesiologist had to reschedule a vacation due to understaffing). Although perhaps pleaded *to* demonstrate a possible vacancy in the Department, these "specifics" blur from sight information giving rise to Vakharia's alleged claims. An example at the opposite end of Vakharia's pleading spectrum surfaces when, despite Vakharia's allegation of racial discrimination, Vakharia fails to set forth information demonstrating racial animus on the part of most of the approximately 500 Defendants.