**Warren L. BRATTON and Eugenia Bratton, Plaintiffs–Appellants,**

v.

**ROADWAY PACKAGE SYSTEM, INCORPORATED, Edward Howenstein, Scott Kolling, Cheryl Barcus and Fred Coffman, Defendants–Appellees.**

No. 95–1560.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1995.

Decided Feb. 22, 1996.

Douglas M. Grimes (argued), Gary, IN, for Plaintiffs–Appellants.

Douglas J. Heckler (argued), Barnes & Thornburg, Indianapolis, IN, Jill D. Jones,

Barnes & Thornburg, Elkhart, IN, for Defendants–Appellees.

Before CUMMINGS, FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Warren Bratton ("Mr. Bratton") delivered packages as an independent contractor for Roadway Package System, Inc. ("RPS") from February 1990 until February 1994. For several years Mr. Bratton's wife, Eugenia Bratton ("Mrs. Bratton"), assisted Mr. Bratton by delivering packages in vehicles owned by the Brattons. In February of 1994, RPS terminated Mr. Bratton's contract, and the instant suit followed against RPS and several of its employees (the defendants will be referred to collectively as "RPS"). Mr. Bratton alleged breach of contract, race discrimination under 42 U.S.C. § 1981, a first amendment violation, and failure to pay vacation pay. Mrs. Bratton alleged race and sex discrimination under 42 U.S.C. § 1981. The district court granted summary judgment in favor of RPS on all counts. The Brattons appeal the district court's decision with respect to the breach of contract claim and the race and sex discrimination claims.

## I.

As we are reviewing a grant of summary judgment, we present the facts in the light most favorable to the Brattons, the non-moving party. *Zenith Electronics Corp. v. Panalpina, Inc.*, 68 F.3d 197, 201 (7th Cir. 1995). Warren Bratton, an African American, entered into a written contract with RPS to pick up and deliver packages in the Elkhart, Indiana area. The contract, drafted by RPS, was entitled "Agreement for Leased Equipment and Independent Contractor Services" ("the Agreement") and was dated February 26, 1990. In the Agreement, RPS identified itself as a "duly licensed common and contract carrier by motor vehicle" operating under authority from the Interstate Commerce Commission and state agencies. Mr. Bratton was identified as an independent contractor.

Pursuant to the Agreement, RPS leased from Mr. Bratton a certain vehicle listed on an addendum to the Agreement, namely a 1990 step van owned by Bratton ("leased equipment"). Mr. Bratton was specifically required to maintain the leased equipment in "accordance with the safety and equipment standards specified in applicable" federal, state, and municipal laws, and Department of Transportation ("DOT") regulations. In fact, many of the provisions in the contract referred exclusively to the leased equipment, including sections on equipment identification requirements, insurance coverage, operating expenses, and liability. However, paragraph eleven of the Agreement stated generally that "[RPS] and [Bratton] each agree to abide by all applicable federal, state and municipal laws and regulations." There is no reference to leased equipment in this section. In addition, in paragraph two of the Agreement, Mr. Bratton agreed to "be responsible for the proper performance of [the] Agreement in accordance with all applicable federal, state and municipal laws, regulations and orders."

Paragraph twelve permitted Mr. Bratton to employ persons to assist him in performing his contractual obligations, but required that "[a]ll persons so employed by [Bratton] shall be qualified pursuant to U.S. Department of Transportation safety standards." The section further provided that such qualified persons:

shall be considered employees or agents of [Bratton], ... and shall be subject to [Bratton]'s exclusive direction and control including the selection, hiring, firing, supervising, directing, training, setting of wages, hours and working conditions.... [Bratton] further agrees to:

 A. Bear all expenses associated with qualifying persons employed including, without limitation, the cost of physical examinations, drug screen tests and securing motor vehicle records....

Paragraph thirty-two of the Agreement granted Mr. Bratton the right to terminate the contract upon thirty days written notice, and either party the right to terminate the contract "if the other party breaches this Agreement."

Shortly after Mr. Bratton entered the Agreement with RPS, he determined that it would be helpful in meeting his service goals to have Mrs. Bratton, also an African American, deliver packages in another vehicle. To that end, from February of 1990 until August of 1993, Mrs. Bratton would often drive the Brattons' 1984 Ford Ecoliner van to the RPS Elkhart terminal and load it with RPS packages. She would then deliver the packages in a borrowed RPS uniform.

During this time Mr. Bratton did not assemble any documentation of Mrs. Bratton's qualifications, Mrs. Bratton did not submit a DOT application, and RPS did not approve Mrs. Bratton as an authorized driver or have any records of her employment. Mrs. Bratton did not participate in any pre-employment drug screening, nor did she keep any driving log or mileage chart. The van used by Mrs. Bratton was not approved by RPS as a second vehicle. However, it is evident from the record that the RPS Elkhart terminal manager, Fred Coffman, knew of and approved (if not encouraged) the employment of Mrs. Bratton and the use of the Ford Ecoliner. White contractors also used their personal vehicles to deliver RPS packages during this time. Mrs. Bratton, though, was the only black female that assisted a contractor with deliveries; in fact, she was the only female who assisted with deliveries.

In late August of 1993, Coffman did obtain some documentation from Mrs. Bratton, including a Contractor Information Sheet, a Drivers Annual Certification of Motor Vehicle Violations, a Physical Examination Certificate and Report, and a DOT Driver–Qualification Examination. Mrs. Bratton, though, did not fill out a complete DOT application, was not tested for drugs, and did not begin to maintain a driving log. Mrs. Bratton also did not provide documentation demonstrating that she had one year of verifiable commercial driving experience, which RPS required of all of its drivers. The Brattons' van remained unauthorized by RPS. Shortly thereafter, Coffman was terminated by RPS, in part because he allowed Contractors to use unapproved, unqualified drivers and vehicles.

Coffman was replaced by Cheryl Barcus in September of 1993. Barcus had discussions with Mr. Bratton on three different occasions in September 1993, October 1993, and November 1993. Each time Barcus advised Mr. Bratton that he could not use his personal vehicle or Mrs. Bratton to assist him because neither were DOT qualified or RPS approved. Mr. Bratton was told that his wife did not have a complete driver qualification file or one year verifiable driving experience. Barcus explained to Mr. Bratton exactly how to qualify Mrs. Bratton and have the van approved. Mr. Bratton refused to comply, claiming his contract did not cover additional vehicles and assistants, and that he had been using both the van and Mrs. Bratton for over two years with Coffman's approval. Barcus twice informed Mr. Bratton that his actions were no longer acceptable, and that if he continued them, his contract would be terminated. Mr. Bratton persisted in having his wife deliver packages in their personal van, and in February 1994 RPS terminated Mr. Bratton's contract pursuant to paragraph thirty-two.

Shortly before his termination, Mr. Bratton's delivery route was modified. His route had also been modified three times before. Mr. Bratton claims each modification resulted in a loss of customers and income. Mrs. Bratton testified in her deposition, however, that each time her husband's route was changed, he received more business. Mr. Bratton claims that following three of the four modifications, Gregg Robertson, a white male, was assigned to the profitable routes taken away from him. Mr. Bratton admitted that his contract did not provide for any specific route, and that he was not guaranteed any particular area. Mr. Bratton also conceded that white contractors' routes were also modified and that these drivers were unhappy with the changes.

After Mr. Bratton's termination, he and his wife brought this suit, alleging, among other claims, breach of contract, race discrimination and sex discrimination. On RPS' motion for summary judgment, the district court concluded that Mr. Bratton had breached his contract by violating certain DOT regulations, and thus RPS had a valid defense to

the contract claim. The court also found that neither Mr. nor Mrs. Bratton could establish a prima facie case of race discrimination, and that Mrs. Bratton had no statutory basis for a sex discrimination claim. The court therefore granted RPS' motion for summary judgment.

## II.

We review grants of summary judgment *de novo*, construing the record in the light most favorable to the motion's opponent. *Zenith,* 68 F.3d at 201. Summary judgment is appropriate if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). If no reasonable jury could return a verdict for the non-moving party, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the party opposing a motion for summary judgment will bear the burden of proof on an issue at trial, he must go beyond the pleadings and affirmatively establish a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The Brattons appeal the decision of the district court, claiming the evidence establishes genuine issues of material fact as to whether RPS breached their Agreement with Mr. Bratton and discriminated against the Brattons on the basis of race and sex.[1]

## A.

We begin with the breach of contract claim. The Agreement between RPS and Mr. Bratton included a valid choice of law provision selecting Pennsylvania law as governing. Under Pennsylvania law, "[t]he paramount goal of contract interpretation is to ascertain and give effect to the parties' intent." *Polito v. Polito,* 440 Pa.Super. 328, 655 A.2d 587, 589 (1995); *Geisinger Clinic v. Di Cuccio,* 414 Pa.Super. 85, 606 A.2d 509, 515 (1992). If the language of the agreement is clear and unambiguous, the intent of the parties is to be derived only from the express language of the contract. *Henderson v. State Farm Mutual Ins. Co.,* 292 Pa.Super. 333, 437 A.2d 411, 414 (1981); *Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers' Association Ins. Co.,* 512 Pa. 420, 517 A.2d 910, 913 (1986). Further, courts should adopt the interpretation of the contract that is reasonable and probable in light of the parties' intent. *Wrenfield Homeowners Assoc., Inc. v. DeYoung,* 410 Pa.Super. 621, 600 A.2d 960, 963 (1991).

RPS contends that it legitimately terminated Mr. Bratton's contract because Mr. Bratton had breached the Agreement. *See Ott v. Buehler Lumber Co.,* 373 Pa.Super. 515, 541 A.2d 1143, 1145 (1988) (a party who has materially breached a contract cannot insist on performance). RPS claims that Mr. Bratton violated DOT regulations by using his personal vehicle and receiving the assistance of his wife. Mr. Bratton's primary contention is that the Agreement only required DOT compliance with respect to the leased equipment identified in the contract. He thus argues that the contract did not give RPS any right to enforce federal regulations with respect to additional vehicles *or* the individuals who assisted through the use of the additional vehicles. We cannot accept Mr. Bratton's interpretation of the contract.

1. The Brattons also claim on appeal that the district court abused its discretion by considering new evidentiary material attached to RPS' reply brief and by not accepting a certain audio tape submitted by the Brattons. The district judge considered the evidence in RPS' reply brief in order to allow a full analysis of the issues and in light of the Brattons' own misuse of the system and the rules. We consider the Brattons' appeal of this decision waived, as the Brattons have failed to develop the argument in any meaningful manner. *Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir.1986), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987). The Brattons

do not identify what evidence they object to or explain why consideration of that evidence by the court below was prejudicial to their case. Further, they cite no authority in support of their argument that the district court abused its discretion under the circumstances. We also find the Brattons' claim with respect to the audio tape without merit. The district court rejected the tape because it was not authenticated in any way. The Brattons on appeal make no showing that this finding was error, they simply make the irrelevant argument that the tape was not hearsay.

It is true that many of the Agreement's provisions exclusively addressed requirements for leased equipment and that no provision expressly addressed requirements for second vehicles. However, Mr. Bratton cannot evade the fact that paragraphs two and eleven of the Agreement compelled him to perform his contractual obligations according to "all applicable federal, state and municipal laws and regulations." Thus, to the extent Mr. Bratton employed his personal van and engaged additional drivers to accomplish his contractual duties, the express language of the Agreement required him to comply with all applicable laws and regulations. Further, Mr. Bratton's interpretation ignores paragraph twelve of the Agreement, which explicitly required drivers employed to assist him in his RPS obligations be DOT qualified, regardless of what vehicle they drove. Mr. Bratton cannot circumvent this responsibility simply by placing the unqualified driver into an unleased vehicle. Therefore, we find that RPS had a contractual right to demand that Mr. Bratton comply with DOT regulations applicable to his additional driver and vehicle. We agree with the district court that it would *not* be a reasonable interpretation of the contract to find that RPS required strict compliance with federal regulations if packages were delivered in leased vehicles, but were indifferent to compliance if packages were delivered in unauthorized vehicles by unqualified drivers.

Mr. Bratton next contends that, even if the terms and conditions of the Agreement required additional equipment and assistants to comply with DOT regulations, he did not violate any regulations "applicable" to him. RPS argued below, and the district court found, that Mr. Bratton did not comply with DOT regulations requiring "motor carriers" to conduct pre-employment drug screening of drivers (49 C.F.R. § 391.103) and to implement random drug testing (49 C.F.R. § 391.109). The court also found that Mr. Bratton neglected to have Mrs. Bratton maintain a driver's log book (49 C.F.R. § 395.8) and failed to assemble a driver qualification file on Mrs. Bratton (49 C.F.R. § 391.51). Mr. Bratton conceded that Mrs. Bratton was not drug tested at any time, that she did not keep a driver's log and that no driver qualification file was kept on her.

Mr. Bratton's response is that the above obligations are only imposed upon "motor carriers," which he was not. Therefore he did not violate any "applicable regulations." [2] Mr. Bratton argues that, under the contract, RPS identified itself as the ICC licensed motor carrier, while Mr. Bratton was merely an independent contractor. Although Mr. Bratton is correct that the regulations cited are directives only to "motor carriers," we find his argument unavailing for several reasons. First, Mr. Bratton did not argue to the district court that the regulations cited by RPS were not applicable to him because he was not a "motor carrier." He argued only that the contract did not require that additional vehicles and the drivers who use them be in DOT compliance. Thus, Mr. Bratton has waived the argument on appeal. *See Teumer v. General Motors Corp.,* 34 F.3d 542, 545–46 (7th Cir.1994); *Publishers Resource, Inc. v. Walker–Davis Publications,* 762 F.2d 557, 561 (7th Cir.1985).

■ In addition, Mr. Bratton has cited no legal authority or regulation that casts doubt on the district court's conclusion that Mr. Bratton was a "motor carrier" as defined in the Federal Motor Carrier Safety Regulations. He provides no legal support for his argument that only ICC authorized carriers are "motor carriers" under the regulations. The district court looked to the definition set forth in 49 C.F.R. § 390.5, which defines "motor carrier" as a "for-hire motor carrier or a private motor carrier." The same section defines "for hire motor carrier" as a "person engaged in the transportation of goods or passengers for compensation." In-

2. Mr. Bratton also argues that Mrs. Bratton was not required to maintain a log under the regulations because she was not a driver of a commercial vehicle. Upon review of the regulation at issue, we find it unclear whether 49 C.F.R. § 395.8 applies only to drivers of commercial vehicles or to all drivers of motor carriers. However, because there are other regulations that clearly apply to Mrs. Bratton and her driving of the van that were admittedly not complied with, it is unnecessary for us to determine the issue. Mr. Bratton does not argue that the other cited regulations did not apply to Mrs. Bratton.

terpreting these definitions and examining the undisputed evidence presented in this case, we cannot say the conclusion by the district court that Mr. Bratton was a "motor carrier" and thus breached his contract was erroneous.

Finally, we need not conclude that Mr. Bratton was a "motor carrier" under the regulations (and thus responsible for enforcing the provisions cited by the district court) in order to find that he breached his contract. Mr. Bratton focuses on his obligations under the regulations, yet neglects his express promises under the contract. Under paragraph twelve of the Agreement, he explicitly agreed that he would hire only employees who were DOT qualified and he agreed to bear the expenses associated with qualifying them. Therefore, even if Mr. Bratton was not responsible for qualifying drivers under the regulations (because he was not a motor carrier), he was required by contract to ensure that RPS qualified Mrs. Bratton before he employed her. Mr. Bratton did not do this.[3] In fact, he repeatedly resisted RPS' attempts to qualify Mrs. Bratton and to comply with its obligations under the regulations. Mr. Bratton's knowing employment of a non-DOT qualified driver was a clear breach of his contract. Thus, we conclude that, absent any waiver, Mr. Bratton's contract required additional drivers to be DOT qualified and that, since Mrs. Bratton was not, RPS legitimately terminated the contract.

 Finally, Mr. Bratton contends that, even if he breached the contract by not following DOT regulations, RPS waived its right to strictly enforce paragraphs eleven and twelve. Mr. Bratton points to the conduct of RPS terminal manager, Fred Coffman, who approved and encouraged the use of the unauthorized vehicle and driver for a significant period of time. Parties may implicitly or explicitly waive enforcement of a

contract provision by not requiring strict performance. *Trumpp v. Trumpp*, 351 Pa.Super. 205, 505 A.2d 601, 603 (1985). However, a party that has arguably waived enforcement of a certain provision may renew the obligation by giving the other party notice of its intention to subsequently enforce the provision. *Matevish v. School Dist. of Borough of Ramey*, 167 Pa.Super. 313, 74 A.2d 797, 801 (1950). Thus, even if the actions of Fred Coffman waived RPS' right to enforce paragraphs eleven and twelve of the contract, RPS successfully renewed its enforcement rights through the actions of Cheryl Barcus. Barcus explicitly told Mr. Bratton on three separate occasions, over the course of three months, that he would have to qualify Mrs. Bratton and comply with DOT regulations if he wanted to continue using his wife and the family van. Mr. Bratton was emphatically and repeatedly warned that his actions were in violation of the Agreement, and that if he continued them RPS would terminate his contract. No reasonable jury could find that the warnings Mr. Bratton received in the three months prior to his termination failed to give him adequate notice that RPS intended to renew strict enforcement of paragraphs eleven and twelve.

We conclude there remain no genuine issues of material fact as to whether RPS was justified in terminating Mr. Bratton's contract in light of his breach. Thus, the district court was correct in granting summary judgment in favor of RPS on the breach of contract claim.

**B.**

The Brattons also appeal the district court's grant of summary judgment with respect to their § 1981 race and sex discrimination claims. The Brattons claimed that RPS discriminated against them on the basis of race in the following ways: 1) by allowing white contractors to use their personal vehi-

---

3. Although the documents Mrs. Bratton submitted to Coffman were a step towards DOT qualification, after a review of the documents and the regulations, it is clear that all requirements were not met. For example, there is no finding by RPS that Mrs. Bratton could safely operate the type of motor vehicle she drove, that she knew whether the cargo she transported was properly

located, distributed and secured, or that she was familiar with methods for securing cargo. 49 C.F.R. § 391.11(b)(3)(4)(5). An inquiry into Mrs. Bratton's driving record and employment history was not made within 30 days of her employment, as required by 49 C.F.R. § 391.23. Finally, Mrs. Bratton did not submit to a pre-employment drug screen, as required by 49 C.F.R. § 391.103.

cles for RPS deliveries; 2) by modifying Mr. Bratton's route to his economic detriment; and 3) by having Mrs. Bratton as the only African American female assistant driver. Mrs. Bratton claims she was discriminated against on the basis of her sex because she was the only female assistant driver and was not allowed to help her husband. The district court found that the Brattons were unable to show that white contractors were treated more favorably and thus had failed to establish a prima facie case of race discrimination. The court also found that there was no statutory basis for Mrs. Bratton's sex discrimination claim.

■■■■ We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act. *Pilditch v. Board of Education of City of Chicago,* 3 F.3d 1113, 1116 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994). The Brattons assert that they have valid claims of race discrimination under the burden-shifting analysis announced by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this analysis, the Brattons must first establish a prima facie case of race discrimination by showing: 1) that they are a member of a protected class; 2) that they were performing according to RPS' legitimate expectations; 3) that they suffered an adverse contractual action; and 4) that similarly situated white individuals were treated more favorably. *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1132 (7th Cir.1994). We agree with the district court that the Brattons have failed to show that white contractors were treated more favorably with respect to any of their three claims.

■■■ Mr. Bratton alleges that white contractors were allowed to use their personal vehicles for deliveries, while he was not. However, Mr. Bratton fails to produce evidence that RPS or its agents knew of and authorized this use. In addition, Mr. Bratton does not allege that this activity by white contractors occurred after September, 1993, when Fred Coffman was dismissed and Cheryl Barcus was hired. Prior to this time, Mr. Bratton was also allowed to use his personal

vehicle and therefore was not receiving any less favorable treatment. Thus Mr. Bratton's evidence could not lead any reasonable juror to conclude that he was treated less favorably with respect to the use of personal vehicles.

■■■ Mr. Bratton also alleges race discrimination based on the fact that his route was modified to his detriment several times and that the most profitable portions were given to a white contractor. We note that Mrs. Bratton's testimony contradicts her husband's assertion that the modifications resulted in a loss of customers to him. However, even accepting Mr. Bratton's allegation as true and considering the fact that a white contractor received profitable portions of Mr. Bratton's route, his evidence is still insufficient to prevail. This is because Mr. Bratton's evidence does not demonstrate that white contractors (other than Gregg Robertson) whose routes were modified were treated more favorably. It is Mr. Bratton's burden to establish that the routes of white contractors were *not* modified in a similar fashion to his. He has not done this. On the contrary, his own testimony supports the opposite conclusion; Mr. Bratton admitted that the routes of white contractors were modified, that they were unhappy with these changes and that they complained about them as he did.

■■■ Mrs. Bratton claims that she was discriminated against on the basis of her race because she was the only African–American woman that assisted a contractor. However, we fail to see how this in any way proves that white assistants were treated more favorably. Mrs. Bratton presents no evidence that shows unqualified white assistants were allowed to continue working after Cheryl Barcus came on board or that white assistants were treated differently in any way. Therefore her claim must fail.

■■■ With regard to Mrs. Bratton's sex discrimination claim, she may not proceed with the claim under Title VII because she was not an RPS employee, *Knight v. United Farm Bureau Mut. Ins. Co.,* 950 F.2d 377, 380 (7th Cir.1991), and because she did not file a charge with the Equal Employment

Opportunity Commission and obtain a right to sue letter. 42 U.S.C. § 2000(e)–5; *EEOC v. Harris Chernin, Inc.*, 10 F.3d 1286, 1288 n. 3 (7th Cir.1993). Mrs. Bratton therefore argues that she should be allowed to pursue her claim under 42 U.S.C. § 1981. However, as the district court correctly noted, we have held that § 1981 does not provide a cause of action for sex discrimination claims. *Movement for Opportunity & Equality v. General Motors Corp.*, 622 F.2d 1235, 1278 (7th Cir. 1980); *Seidel v. Chicago Savings & Loan Assoc.*, 544 F.Supp. 508, 509 (N.D.Ill.1982). Thus, Mrs. Bratton has no statutory basis for her claim.

### III.

For the foregoing reasons, we conclude that the district court properly granted summary judgment in favor of RPS on both the breach of contract claim and the race and sex discrimination claims. We thus AFFIRM the judgment of the district court.